## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TOMMY BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 10-237-CG-B** |
| | ) | |
| **BERG SPIRAL PIPE CORP.,** | ) | |
| **Defendant,** | ) | |
| | ) | |

## ORDER

This matter is before the court on defendant's motion for summary judgment. (Doc. 47). The parties have filed briefs and filed evidentiary materials in support of their respective positions (Docs. 48, 59, 62, 71, 81, and 89), and the motion is now ripe for resolution. After careful consideration of the foregoing, the court concludes that the motion is due to be **GRANTED**.

## I.       FACTUAL BACKGROUND

Plaintiff's cause of action arises under 42 U.S.C. §1981. Plaintiff alleges that he was subject to intentional racial discrimination and retaliation while he was employed by the defendant, and seeks declaratory, injunctive, and equitable relief, compensatory damages, punitive damages, as well as interest, attorneys fees, expenses, and costs. (Doc. 1, pp. 6-9). Defendant has moved this court for summary judgment as to all of plaintiff's claims. (Doc. 47, p. 1).

1

Plaintiff, Tommy Brown ("Brown"), is an African-American male who worked for the defendant, Berg Spiral Pipe Corp. ("Berg"), as a support operator from February 2, 2009, until his termination on April 25, 2009. (Doc. 93, p. 1). Brown alleges that while he was employed by Berg he was subject to intentional racial discrimination in the form of unjust reprimands, denial of pay, denial of training, denial of positions, and termination. (Doc. 1, p. 6). Brown also alleges that his termination was an unlawful act of retaliation for Brown's having complained to Berg's human resources manager about the alleged racial discrimination. (Id. at 8), (Doc. 62, p. 28).

Berg specializes in spiral pipe production for the oil and gas industries and has its manufacturing facility located in Mobile, Alabama. (Doc. 93, p. 8). Berg's Mobile facility consists of a pipe mill, which rolls steel into pipe, and a coating mill, which applies a fusion-bonded epoxy to both the outside and inside of the pipe. Id. The coating mill was built from 2008 to 2009, and began operating in August 2009 after the pipe mill began operation. Id. The two mills are housed in separate facilities and utilize different supervisors. (Doc. 48-1, p. 1). Berg has a sister company, eb Pipe Coating ("eb Pipe"), which is located in Panama City, Florida. (Doc. 93, p. 8).

Brown worked as an hourly exit rack coordinator in the coating mill at eb Pipe in Panama City from 2007 until 2009. (Doc. 59-11, pp. 3-4). In late 2008, Brown sought to transfer to Berg. (Doc. 93, p. 8). He interviewed for a position with Jim Key, the human resources manager, in December 2008 (Doc 59-11, pp. 5-6).

Key told Brown that he wanted Brown to train workers in Berg's coating mill and then move over to the pipe mill, an arrangement that Brown understood and accepted. (Doc. 93, p. 8). Brown received an offer letter dated December 23, 2008, which set forth the terms of his new employment at Berg, including being placed on a 90 day introductory period. (Doc. 93, p. 8). The letter states:

> **Hire date:** Your start date is scheduled for Monday, February 2, 2009 unless another date is mutually agreed upon. **Your introductory period of employment will begin effective this date** and your work performance will be evaluated by your supervisor after 45 days and again at 90 days of employment service. This date will be considered your seniority date and will be used to administer any potential adjustments to the work force such as layoffs and recalls to work. **Benefits:** Your initial hire date at Berg Steel Pipe Corp., Panama City, Florida will be used to determine eligibility for benefits such as vacation, group health, and 401(k) plan participation. (Id. at 9-10). [emphasis added].

Brown also received and signed for an Employee Handbook, No Harassment Policy, and Equal Employment Opportunity Policy. (Id. at 10).

Brown was one of eight eb Pipe employees who transferred to Berg in February 2009, six of whom were white and two of whom were African-American. (Id. at 9). All eight employees were allowed to continue their health insurance, retirement benefits, and vacation benefits as accrued from their start date at eb Pipe. Id. Additionally, one of these eight transferring employees, Charles Weidinger, who is white, received a relocation assistance package. Id. The other

seven transferring employees did not receive relocation assistance packages. (Doc. 48-1, p. 3).[1]

When Brown started work in the coating mill, it was not yet operational, nor would it be operational during Brown's tenure at Berg. (Doc. 93, p. 10). Brown helped to set up the facility under the supervision of the coating mill's supervisor, Stanley Key. Id. There were also two employees who were "team leads," at the coating mill, along with Berg's shipping department supervisor, Jason Milam. Id., (Doc. 48-1, p. 155). After three weeks in the coating mill, Brown sought and received a transfer to the pipe mill. (Doc. 93, p. 10). Brown alleges that he sought this transfer because of racial discrimination in the coating plant, and further alleges that he brought these concerns to Jim Key at the time. (Doc. 56-11, p. 26).

To illustrate what Brown believed was racial animosity in the coating plant, Brown informed Jim Key of a group photo of three or four coating mill employees which was posted in a locked bulletin board. (Doc. 56, pp. 25-26). Brown was in the group photo at one end of the group that was posing for the picture, Id., and was the only African-American employee in the photo. (Doc. 59-12, p. 5). Someone had placed a piece of paper on the bulletin board in such a way that Brown's image was covered. (Doc. 93, p. 10). Jim Key investigated that same day and determined that the shipping department supervisor, Jason Milam, placed a copy of a pipeline map

_____

[1] In July 2009, however, Berg decided to provide relocation assistance retroactively to those employees who began in February 2009 and who were still employed in July. (Doc. 48-1, p. 3). Brown and another employee, Tom Jennings, who is white, were no longer employed by this time, and therefore did not receive the relocation assistance. Id.

on the bulletin board, which overlapped with the employee group photo. (Doc. 48-1, p. 3). Milam and Brown had little interaction with each other at Berg and no apparent conflict (Id. at 80). Milam asserts that he did not intentionally cover Brown's image and that his placing of the map over Brown's picture was inadvertent. (Id. at 156). Brown admits that Jim Key removed the map covering his photo on the same day that they spoke. (Id. at 103).

Brown subsequently was transferred to the pipe mill where he reported to the team lead, Ken Johnson. (Doc. 93, p. 10). Johnson, in turn, reported to production manager, Denis Desjardin. Id. Brown started at the cutting station of the "first inspection" section cutting off pipe defects. Id. Brown's responsibilities included placing tracking numbers on both ends of the pipe, and placing both a tracking number and a color-coded band on any scrap piece of pipe. (Doc. 48-1, pp. 44, 46). Brown was verbally reprimanded at least once by Johnson and Desjardin while working at the cutting station for not putting tracking numbers or color-coded bands in or around pieces of scrap pipe. (Id. at 45).

Brown then moved to the clean out inspection station of the "first inspection" section. (Doc. 93, p. 11). At the clean out inspection station, Brown was responsible for placing numbers on both ends of the pipe before it proceeded down the production line. Id. Brown worked with and was trained at the clean out inspection station by Nick Morris, who is white. (Doc. 62, pp. 11-12). On one occasion, Brown and Morris were verbally reprimanded by Johnson because they did not place numbers on pipes that passed through their station. (Doc. 48-1, pp. 49-50). Brown

admits to a another occasion when he forgot to place tracking numbers on pipes passing through the clean out inspection station, but asserts that no one from management said anything to him about it. (<u>Id.</u> at 57). Johnson also verbally reprimanded Brown on one occasion about standing around and talking at work. (<u>Id.</u> at 79).

During his time in the pipe mill, Brown received cross-training in various areas, such as crane operation and fork lift operation. (<u>Id.</u> at 59-62). Brown also took a course in Level 1 radiographic ("X-ray") testing, which was the first stage of X-ray training and consisted of a 40-hour classroom course. (<u>Id.</u> at p. 63). There were no open positions in X-ray testing at the time, but Berg was looking to add second and third shifts in the future, and therefore had started to train employees in X-ray testing. (<u>Id.</u> at 159). Successful completion of this course, on its own, did not qualify Brown to work in X-ray testing because it was only an introductory step in the training process. (<u>Id.</u>).

On the afternoon of April 22, 2009, Johnson told Brown to manually clean out a pipe passing through his station due to a malfunction with a vacuum that normally was used. (Doc. 48-1, p. 81). However, Johnson and Desjardin discovered the following day that Brown had not cleaned out the pipe as instructed and instead left for the day without Johnson's approval. <u>Id.</u> at 82. Both became upset with Brown, and confronted him about it. <u>Id.</u> Brown asserts that he did not follow Johnson's instructions because doing so would have caused him to exceed his hours for the week and go into overtime. <u>Id.</u> Brown further asserts that Johnson also told

Nick Morris to manually clean out the pipe, and that both he and Morris decided instead to do the work the following morning. Id. at 85. Brown does not dispute that Morris was not his supervisor and that neither of them sought Johnson's permission before leaving for the day. Id. at 86.

Approximately one or two days before he was terminated on April 25, Brown went to see human resources manager, Jim Key. Id. at 91. Brown told Key that Johnson and Desjardin informed him (Brown) they were not pleased with his work, and Brown asked Key if he was going to be fired. Id. Key told Brown that he was aware of concerns about Brown's work, but that he was not able to answer Brown's question. Id. Brown also requested a transfer back to the coating mill because Johnson and Desjardin did not like his work. Id. at 92.

Shortly thereafter, Johnson recommended to Desjardin that Brown be terminated, and Desjardin agreed. Id. at 134. Jim Key, the human resources manager, notified Brown on April 25, 2009, that Brown was being terminated for unsatisfactory job performance during his introductory period. Id. at 93.

Brown filed suit on May 10, 2010. (Doc. 93, p. 11).


## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter

but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" <u>Bailey v. Allgas, Inc.,</u> 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting <u>Anderson,</u> 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson,</u> 477 U.S. at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See <u>Anderson,</u> 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. <u>O'Ferrell v. United States,</u> 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. <u>Burton v. City of Belle Glade,</u> 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment." <u>Hinesville Bank v. Pony Exp. Courier Corp.,</u> 868 F.2d 1532, 1535 (11th Cir. 1989) (citing <u>Mercantile Bank & Trust v. Fidelity & Deposit Co.,</u> 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(a), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial."  Vega v. Invsco Group, Ltd., 2011 WL 2533755, *2 (11th Cir. 2011).  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).  "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation and citation omitted).

## III.    MOTIONS TO STRIKE

Before beginning its summary judgment analysis, the court first turns its attention to the multiple motions to strike that both parties have submitted.

### A.    Plaintiff's First Motion to Strike Portions of Declarations Submitted by Defendant in Support of its Motion for Summary Judgment

In his first Motion to Strike (Doc. 56), Brown asks the court to strike certain portions of the declarations of Jim Key and Ken Johnson because he claims that they conflict with the deposition testimony of the two men. (Doc. 56, p. 2).  The Eleventh Circuit has explained in Lane v. Celotex Corp., 782 F.2d 1526, 1532 (11th Cir. 1986), that "we may only disregard an affidavit that 'contradicts, without explanation, previously given clear testimony.' " (quoting Van T. Junkins & Assoc. v. U.S. Indus., Inc., 736 F. 2d 656, 657 (11th Cir. 1984)).  Thus, Eleventh Circuit jurisprudence requires that a court find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit.  The court must also distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." Tippens v. Celotex Corp., 805 F.2d 949, 953 (11th Cir. 1986).

For the reasons enumerated below, the court finds that Brown has not established any inherent inconsistencies between the portions of the declarations he challenges and the corresponding deposition testimony.  Accordingly, Brown's Motion to Strike is denied.

### (i) Declaration of James Key

Brown seeks to strike several portions of the declaration of Jim Key (Doc. 48-1, pp. 1-6), Berg's human resources manager. First, Key states in Paragraph 11 of his declaration that the eight individuals who came to work at Berg from eb Pipe Coating, including Brown, were placed on 90 day introductory periods at Berg. (Doc. 48-1, p. 2). Brown claims that this conflicts with Key's deposition testimony that Brown was eligible for health insurance, vacation benefits and was entitled to participate in defendant's 401(k) program. (Doc. 56, p. 3). The court finds no inherent conflict in these statements. Berg has maintained throughout these proceedings that plaintiff was placed in an introductory status when he arrived to work at defendant, and that he was eligible for certain benefits based on his hire date at eb Pipe Coating. Brown does not explain how these two statements cannot both be true.

Second, Brown moves to strike paragraph 31 of Key's declaration, which states that Brown was terminated at the determination of his supervisor, Ken Johnson, and Denis Desjardin, the pipe mill production manager. (Doc. 48-1, p. 4). Brown claims this is inconsistent with Key's deposition testimony in which he admitted to participation in Brown's termination. (Doc. 56 at p. 4). Once again, the court finds no inherent conflict in these statements. Key consistently maintained in his deposition that his participation in plaintiff's termination was limited to ensuring that Berg's company policy was followed and reiterated that, as human resources manager, he does not make determinations as to whether an employee is

discharged or not. (Doc. 64-1, pp. 32-33). There is no basis for striking this part of his declaration.

Next, Brown asks the court to strike Paragraph 36 of Key's declaration, in which he asserts that "Brown came to me stating he was concerned Johnson and Desjardin were going to fire him because of his performance." (Doc. 48-1, p. 5). According to Brown, this statement directly contradicts Key's deposition testimony in which he said "what prompted the conversation was [Brown] was not on the overtime roster and that [Johnson and Desjardin] told him that they were not pleased with his work and he asked me if he was being fired." (Doc. 64-1, p. 23). The court finds no basis for striking this part of the declaration. Far from being directly contradictory, these two statements can reasonably read as being entirely consistent with one another, and as actually saying the same thing using different language.

Finally, Brown seeks to strike paragraphs 24, 28, and 29 of Key's declaration. Brown asserts that the statements are not based on personal knowledge, and therefore do not comport with Federal Rule of Civil Procedure 56(c)(4)[2], which requires that affidavits or declarations used to support or oppose a summary judgment motion must be made upon personal knowledge. Paragraph 24 of Key's declaration, regarding the covering up of Brown's picture, was based on his personal participation in the investigation of the incident at the request of Brown.

---

[2] Brown actually cites Fed. R. Civ. P. 56(e) in his Motion to Strike, but the court infers that he intended to cite Fed. R. Civ. P. 56(c)(4).

Furthermore, the statement is ultimately the opinion of Key based on his investigation, and not a fact in and of itself, and will be considered as such by the court in ruling on Berg's motion for summary judgment. Paragraphs 28 and 29 deal with certain training obtained by Brown while working for defendant. Although Key says the statements are based on his "understanding," he also states that all of the information in his declaration is based on his "personal knowledge." (Doc. 48-1, p. 1). Further, it is reasonable to believe that Key, as the human resources manager, would have personal knowledge of the training provided to Berg's employees. Finally, Brown has not disputed the fact that he received the training discussed in the declaration, so his point here is essentially a moot one.

### (ii) Declaration of Oris Kenneth Johnson

Brown first seeks to strike Paragraphs 8 and 11 of the declaration of Oris Kenneth Johnson ("Johnson") because Johnson used the word "counseled" in his declaration, and used the term "talked" in his deposition when testifying as to Brown's job performance and discussions between the two. (Doc. 56, pp. 6-7). This issue merits little attention. The words "counseled" and "talked" are synonymous and therefore cannot be directly contradictory with one another. That Johnson used one word at his deposition and the other in his declaration provides no basis for striking any portion of the declaration.

Secondly, Brown asks that the court strike the paragraphs 21, 22, and 24 of Johnson's declaration, which concern his interactions with plaintiff over the manual

cleaning of a pipe. (Doc. 56, p. 7). This is based on the fact that the declaration omits mention of Nick Morris ("Morris"), Brown's co-worker, while in his deposition, Johnson states that it was his intention to have both plaintiff and Morris clean out the pipe. (Doc. 59-13, p. 6). Once again, the two statements in question are not inherently inconsistent. There is nothing in Johnson's declaration which states that he did not ask Morris to participate in the clean out. Brown is certainly entitled to point to Johnson's deposition testimony if he believes it creates a genuine dispute of material fact sufficient to defeat summary judgment, and has availed himself of this opportunity (Doc. 81, pp. 8-9), but he is not entitled to have this portion of Johnson's deposition stricken.

Finally, Brown moves to strike Paragraphs 26 and 27 of Johnson's declaration, two portions of which deal with the decision to terminate him. (Doc. 56, p. 9). Brown objects to Johnson's declaration that he "recommended" that Brown be terminated. Id. A review of the relevant parts of Johnson's deposition reveals nothing inherently inconsistent with his declaration that he recommended plaintiff's termination. (Doc. 59-13, p. 5). The fact of the matter is that Johnson was never directly asked in his deposition whether or not it was his recommendation to fire Brown. If it was his recommendation, it would not be inconsistent for him to testify that he and Desjardin acted on his recommendation and decided to terminate Brown. For the same reasons, Brown's objection to Johnson's declaration that Desjardin supported his decision to terminate Brown is without merit. Considered in its context, this statement is entirely consistent with Johnson's position that it

was his recommendation to terminate plaintiff, that he brought his concerns to the attention of his supervisor, Desjardin, and the two of them, along with Key, made the ultimate determination to fire Brown. Brown has given the court no valid reason to strike these portions of Johnson's declaration.

**B. Defendant's Motion to Strike Charles Weidinger's Affidavit**

In support of his Opposition to Summary Judgment, Brown filed the affidavit of Charles Weidinger ("Weidinger"). (Doc. 59-8). In the affidavit, Weidinger testifies to the quality of Brown's work, the circumstances of Weidinger's move to Mobile to work for Berg, his observations of racially suspect activity at the Berg facility, and an incident in which a photograph of Brown was covered up on a bulletin board. Berg has moved to strike Wiedinger's affidavit. (Doc. 69).

It is undisputed that Brown, in his initial and supplemental Rule 26 disclosures, failed to list Weidinger as someone who was likely to have discoverable information. Brown also failed to list Weidinger in response to Berg's interrogatory asking plaintiff to identify all persons who he believed may have information relating to the claims or defenses in the case. (Doc. 69-1, pp. 36-37). The only notice relating to Weidinger in the written discovery in the case came in response to Berg's interrogatory asking Brown to identify comparators, similarly situated employees who were allegedly treated differently than plaintiff. In response to the question, plaintiff responded: "Charles – received a relocation package and help with finding

a house. When I asked, I was turned down." (Doc. 69-1, p. 37). Discovery in this case closed April 11, 2011.

Berg argues that Weidinger's affidavit should be stricken because Brown failed to properly disclose him as a potential witness. Rule 37(c)(1) of the Federal Rules of Civil Procedure provides in pertinent part:

> Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

In ruling on the exclusion of a witness or his testimony, a district court is to consider: (1) the importance of the testimony; (2) the reason for the appellant's failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness had been allowed to testify. Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc., 389 F.3d 1339, 1353 (11th Cir. 2004).

Brown responds by claiming that defendant was made aware prior to the litigation, as well as in Brown's response to interrogatories, that Weidinger was a potential witness. However, this notice or awareness only related to the fact that Weidinger received relocation assistance in his move from Panama City, Florida, to

Mobile. Berg does not and has not disputed the fact that Weidinger received this assistance. It was only when Brown filed his response to the summary judgment motion that Berg was made aware of the scope of Weidinger's purported knowledge about this case.

Brown cites <u>Ojeda-Sanchez v. Bland Farms, LLC,</u> 2010 WL 2382542 (S.D. Ga. June 14, 2010), in support of his position, but that case actually supports the striking of Weidinger's declaration. In that case, plaintiffs moved to strike the affidavits of two witnesses submitted by the defendants where, as here, the witnesses were not disclosed pursuant to Rule 26. <u>Id.</u> at *1. The defendants responded by pointing out that the names of the witnesses were mentioned in a deposition. <u>Id.</u> While noting that in determining such a motion, "the focus is on whether the moving party is aware that the affiant is an individual with discoverable information . . .," the court proceeded to consider the context in which each witness' name arose. <u>Id.</u> at *1-2. The affidavits in question concerned certain contract negotiations. <u>Id.</u> at *2. In the deposition under consideration, one witness was identified only as someone who worked in the defendant's sales department. <u>Id.</u> The second witness was discussed in the deposition as someone who may have participated in the contract negotiations. <u>Id.</u>

The court in <u>Ojeda-Sanchez</u> ruled that the affidavit of the first witness was to be excluded because it could not "say from this limited disclosure that Plaintiffs were alerted to the fact that [the first witness] had discoverable information relating to contract negotiations . . . ." <u>Id.</u> The court also noted that there was no

indication that the exclusion of the witness from Rule 26 disclosures was harmless or substantially justified. Id. On the other hand, the court found that the defendants were excused for their failure to disclose the second witness under Rule 26 because the plaintiffs should have been aware from the deposition that the witness "had discoverable information related to the topics testified to in his affidavit." Id.

In the instant case, Brown admits that he did not disclose Weidinger pursuant to his Rule 26 obligations. (Doc. 83, p. 4). He also acknowledges that his only mention of Weidinger in the written discovery was the disclosure that Weidinger was a potential comparator for Brown because he received relocation assistance, a fact not disputed by defendant. Id. Brown states that "Weidinger was discussed in every deposition taken in the case," but does not cite from any deposition transcript. Id. In this situation, it is Brown's duty to direct the court to the portions of such transcripts which he contends placed defendant on notice of the nature of the discoverable information possessed by Weidinger. The court will not undertake to do this for Brown. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Brown also claims that any failure to disclose Weidinger and the nature of the information he possessed was both substantially justified and harmless. (Doc. 83, p. 6). That is Brown's burden as the non-producing party. Stallworth v. E-Z Serve Convenience Stores, 199 F.R.D. 366, 368 (M.D.Ala. 2001). Brown argues that his actions were justified in that he only learned about Weidinger's information in

May 2011 when Weidinger called the office of plaintiff's counsel. (Doc. 83, p. 4). Brown is, of course, free to prepare his case as he sees fit, but as the party with the burden of proof, he must marshal his facts and evidence so that Berg has a proper opportunity to respond. If instead of actively seeking out evidence, he waits for it to come looking for him, he runs the risk of that evidence being excluded. Brown either knew or should have known that Weidinger possessed potentially relevant and discoverable information. If he wanted to be able to use that information, it was incumbent upon Brown to contact Weidinger to determine what information he might have, and to do so within the case management framework established by the Federal Rules of Civil Procedure. Accordingly, the court cannot agree that Brown's untimely disclosure of Weidinger and his information is substantially justified.

Likewise, the court finds that allowing this declaration to stand would prejudice Berg. Discovery in this case closed on April 11, 2011. Berg's summary judgment motion is ripe and under consideration by the court. Because it cannot depose him under the current schedule, defendant is unable to respond to Weidinger's declaration. This is clear prejudice to Berg.

Therefore, Berg's motion to strike (Doc. 69) is granted. Because of this order, the court need not consider defendant's substantive objections to the contents of the declaration.

## C.    Plaintiff's Motion to Strike Portions of James Robert Key's Supplemental Declaration

In his second Motion to Strike (Doc. 84), Brown requests that the court strike portions of James Robert Key's Supplemental declaration (Doc. 71-1, p. 116),

without specifying which paragraphs he wishes to strike. Brown claims that it is unlikely for Key to personally recall the hire and discipline dates of "several employees"[3] (Doc. 84 at p. 2). Therefore, according to Brown, Key must have relied upon documents to refresh his recollection. Id. Brown offers no basis for this assertion other than his conclusion that "it is highly unlikely" for Key to remember the dates in question. Id. Nor does Brown cite any legal authority for the proposition that a declarant may not refresh his recollection as he would if he were a witness at trial. Furthermore, as the human resources manager for Berg, it is reasonable that Key would have personal knowledge of the dates that employees were hired. Therefore, this cannot serve as a basis for striking any portion of Key's supplemental declaration.

Brown also complains that Berg did not produce any documents relating to Forrest, Porter, Maleck, or Baughman. Id. However, Berg subsequently filed a "New Employee Checklist" for each of the four employees mentioned in Key's supplemental declaration as part of its opposition to Brown's Motion to Strike. (Doc. 88-1, pp. 1-4). To the extent that Berg did not properly support the factual assertions contained in Key's declaration, this supplement cures the failure. Fed. R. Civ. P. 56(e)(1). Accordingly, this cannot serve as a basis for striking any portion of Key's supplemental declaration.

---

[3] The court infers from its review of Documents 84 and 88 that the "several employees" to whom Brown alludes are Charlie Forrest, Ray Porter, Ronnie Maleck, Jr., and Tom Baughman.

Finally, Brown also objects that Key testified that Forrest, Porter, Maleck, and Baughman were disciplined, but did not testify that he personally disciplined each employee, nor did he specify who actually disciplined each employee. Id. Key testified that he was not aware of Forrest, Porter, Maleck, or Baughman receiving discipline during their introductory periods. (Doc. 71-1, p. 117). Therefore, the question of who disciplined these employees outside of their introductory periods is irrelevant to this case, because such facts do not address whether the men were Brown's comparators. Accordingly, this cannot be a basis for striking Key's references to Porter, Forrest, Maleck, and Baughman.

Brown's second Motion to Strike (Doc. 84) is therefore denied.

## D. Defendant's Motion to Strike Plaintiff's Surreply and Incorporated Memorandum of Law

Because the court has granted Berg's Motion for Summary Judgment as to all counts of Brown's Complaint, Berg's Motion to Strike Plaintiff's Surreply and Incorporated Memorandum of Law (Doc. 89) is denied as moot.

## IV.    ANALYSIS

## A.    RACIAL DISCRIMINATION

### (i)    Statement of the Law

42 U.S.C. §1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts. See, e.g., Johnson v. Railway Express Agency, 421 U.S. 454 (1975) (holding

unequivocally that §1981 protects against racial discrimination in private employment.)  Section 1981 liability must be founded on purposeful discrimination. See General Building Contractors Association v. Pennsylvania, 458 U.S. 375, 389 (1982); Lincoln v. Board of Regents of the University System of Georgia, 697 F.2d 928, 935 n. 6 (11th Cir. 1983).  Thus, a showing of disparate impact through a neutral practice is insufficient to prove a §1981 violation because proof of discriminatory intent is essential. See Id. at 388. (recognizing that the drafters of §1981 were not concerned with practices that were facially neutral).  Accordingly, only direct or circumstantial modes of proving intentional discrimination are available to the §1981 plaintiff. See Larkin v. Pullman-Standard Div., Pullman, Inc., 854 F.2d 1549, 1561 (11th Cir. 1988), overruled on other grounds by Swint v. Pullman-Standard, Inc., 493 U.S. 929 (1989) (where plaintiff proceeded on a theory of disparate impact, plaintiff is limited to Title VII and cannot seek the broader §1981 remedies and longer liability period).

The test for intentional discrimination in suits under §1981 is the same as that used in Title VII discriminatory treatment cases. Ferrill v. Parker Group, 168 F.3d 468 (11th Cir. 1999).[4]  The plaintiff has the burden of establishing a prima facie case of employment discrimination by a preponderance of the evidence. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  This prima facie case can be established in any one of three ways: (1) by presenting direct evidence of

---

[4] However, while Title VII provides only for equitable relief, §1981 provides for both equitable and legal relief, including compensatory and punitive damages. Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 460 (1975).

discriminatory intent; (2) by presenting circumstantial evidence of discriminatory intent through the McDonnell Douglas test; or (3) by demonstrating through statistics a pattern of discrimination. Earley v. Champion International Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).

Where the plaintiff wishes to prove a claim of discrimination through circumstantial rather than direct evidence, the court evaluates the claims using the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell-Douglas framework, the plaintiff must satisfy the initial burden under the statute by establishing a prima facie case of intentional discrimination. Smith v. Lockheed-Martin Corporation, 2011 WL 2567777, *2 (11th Cir. 2011). To do so, the plaintiff must show that (1) he is a member of a protected class (here, African-American); (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) his employer treated him less favorably than similarly situated individuals outside of his protected class. Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). With respect to this last showing, "the individuals must be similarly situated in all relevant respects besides race, since different treatment of dissimilarly situated persons does not violate civil rights laws." Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1273-1274 (11th Cir. 2004) (internal citations and quotation omitted).

If the plaintiff is successful in proving a prima facie case, then a presumption of discrimination or retaliation is raised and the burden shifts to the defendant to

provide a legitimate, nondiscriminatory reason for its employment action. <u>Smith</u>, 2011 WL 2567777 at *2.  If the defendant meets this burden, then the presumption of discrimination is rebutted and disappears. <u>Id.</u>  The inquiry then proceeds to a "new level of specificity," whereby the plaintiff must prove by a preponderance of evidence that the defendant's reason is a mere pretext for unlawful discrimination or retaliation. <u>Id.</u> at *3 (citations omitted).  "Thus, if a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination. <u>Id.</u> at *3 (<u>citing</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 146-48 (2000)).

**(ii)    Brown's Intentional Discrimination Claim**

Brown's claim consists of several incidents which he claims evidence intentional discrimination by Berg.  First, he asserts that he was denied financial relocation assistance when he moved from Panama City to Mobile while a white employee did receive such assistance. (Doc. 1, p. 3).  However, Brown admits that the white employee who received relocation assistance, Charles Weidinger, was recruited by Berg because of his experience as a heavy equipment operator. (Doc. 48-1, p. 20).  Berg asserts that it was for this reason that Weidinger received financial relocation assistance from Berg. <u>Id.</u> at 2.  Accordingly, Weidinger and Brown were not similarly-situated employees, and, therefore, the matter cannot give rise to a <u>prima</u> <u>facie</u> case of discrimination.

Furthermore, the remaining seven transferring employees – five white employees and two African American employees – were all treated the same with respect to the entitlement to relocation assistance (Doc. 48-1, p. 3), which tends to undercut Brown's claim that he was treated differently than similarly situated white employees.

Brown also argues that he was denied a position as an x-ray tester for Berg based on his race. (Doc. 1, p. 4). However, it is undisputed that, at the time Brown was employed by Berg, there were no job openings in the x-ray section of the pipe mill because the position was already filled. (Doc. 48-1, p. 4). Therefore, Brown cannot show that there was a similarly situated white employee who requested and was given such a position. Not being given a job that was not available in the first place is clearly not evidence of discrimination.

Furthermore, Brown claims that he "took all of the required tests to work in x-ray and passed all testing requirements for the position," (Doc. 1, p. 4) but he has offered nothing to support this assertion. On the other hand, Berg has offered the declaration of Dennis Desjardin, the production manager for the pipe mill, who states that Brown took only the Level 1 radiographic testing course, which was one in a series of courses necessary to become qualified in X-ray testing. (Doc. 48-1, p. 159). Without further training and testing, Brown was simply not qualified to work in X-ray testing.

Thus, Brown has failed to establish two of the necessary elements of a <u>prima facie</u> claim of discrimination based on the fact that he was not assigned to the X-ray testing section of the pipe mill.

Brown claims that he was denied opportunities to cross-train at Berg while white employees were cross-trained. (Doc. 1, p. 4). Yet Brown contradicts his own sworn testimony by admitting that he was trained in a variety of skills, such as crane operation (Doc. 71-1, p. 18), X-ray testing (<u>Id.</u> at p. 19), quality awareness (<u>Id.</u> at p. 20), and forklift operation (<u>Id.</u> at pp. 20-21). Brown is further unable to name any white employees who were provided cross-training opportunities that he was denied (Doc. 71-1, pp. 24, 28). Brown claims that he was denied cross-training in welding (Doc. 62, p. 7), yet also admits that he spoke to an African-American employee named Lawrence Smith, who told him that he (Smith) had been cross-trained on a sub-arc welding machine. (Doc. 71-1, p. 29).

"To evaluate the sufficiency of proof of a <u>prima facie</u> case of discriminatory training, courts typically require the plaintiff to show…that he was denied training opportunities provided to similarly situated employees outside the protected class." <u>Woods v. Austal, U.S.A., LLC,</u> 2011 WL 1380054 (S.D. Ala. April 11, 2011). The court finds that Brown falls short of this requirement.

Brown also claims that he "has been unjustly reprimanded for alleged offenses he did not commit and has been harassed and reprimanded when Caucasian employees have not been harassed and/or reprimanded for engaging in the same or similar conduct." (Doc. 1, p. 5).

Brown cites extensively to the deposition testimony of Ken Johnson, his supervisor in the pipe mill, as evidence that five white Berg employees were not disciplined despite doing "the same or worse than Brown." (Doc. 62, p. 17).

Yet Brown offers no evidence that any of these purported comparators were introductory employees or that they committed the same offenses as Brown is alleged to have committed, i.e., forgetting to place tracking numbers on pipes, and leaving work instead of cleaning out a pipe as instructed by his supervisor. (Doc. 48-1, pp. 133-134), (Doc. 48-1, pp. 157-158). The Eleventh Circuit requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Burke-Fowler v. Orange County, Florida, 447 F.3d 1319, 1323 (11th Cir. 2006).

Brown has not identified any introductory employee who engaged in the same conduct to which Brown has admitted, and who was not reprimanded by Berg. Instead, Brown devotes considerable energy to insisting that he was not an introductory employee. (Doc. 62, pp. 20-22). However, Brown has offered no fact which counters the plain language of his offer letter from Berg, namely, that "[y]our introductory period of employment will begin effective this date…" (Doc. 93, p. 9). Therefore, the court must conclude here that Brown has not adequately stated a prima facie case on this issue.

Next, Brown asserts that he asked to be promoted to a supervisor position upon his transfer to Berg's coating mill from eb Pipe, but was told that no

supervisor positions were available. (Doc. 1, p. 3). Brown later contradicted himself at his deposition by stating that he had no recollection of asking to be made a supervisor (Doc. 48-1, pp. 117-118), and stated that he did not consider himself to be "a supervisor type." (Id. at p. 24). Even setting Brown's self-contradictory testimony aside, Brown has not offered any evidence to suggest that there were in fact supervisor positions open and available when he started working at Berg, and he could not identify any similarly-situated white employee (or any person, for that matter) who was made a supervisor in the coating mill while Brown worked there. (Doc. 48-1, pp. 31-32). Nor could Brown identify a single "lead" person who was assigned while he worked in the coating mill. Id. at p. 31. Accordingly, the court concludes that Brown has not adequately stated a prima facie case of intentional discrimination on this issue.

As with the issue of discipline above, Brown does not identify any comparators who were introductory employees, who had the same or similar job performance problems, and who were not terminated by the company. This failure is fatal to Brown's prima facie case of discrimination in his termination.

The court's finding that Brown has failed to make out a prima facie case of discrimination is dispositive of this matter. However, the court notes that even if Brown had made out such a prima facie case, it finds that he has failed to offer evidence to rebut the legitimate reason which Berg offers for Brown's termination, that reason being poor performance during his introductory period.

Brown argues that Berg failed to consistently apply its written policies with regard to introductory employees and progressive discipline, and that this is evidence of pretext. (Doc. 62, p. 25). For example, Brown points out that Berg did not complete a written 45-day employee evaluation of Brown nor otherwise document Brown's poor performance, and, therefore, this raises a question as to whether Berg's proffered reason for terminating him is really a cover for racial discrimination. Id. However, Berg's human resources manager, Jim Key, testified that Brown's supervisor, Ken Johnson, did not typically complete 45-day evaluations of introductory employees, and that company policy did not require a written evaluation. (Doc. 71-1, pp. 76-77). Furthermore, Berg's corrective discipline/dispute resolution policy states that Berg may terminate an introductory employee without resorting to progressive discipline. (Doc. 48-1, p. 182). But even if Berg's policy had required a written evaluation or had not allowed summary termination of an introductory employee, the Eleventh Circuit has found that a company's failure to conform to its progressive discipline policy does not establish pretext. Ritchie v. Industrial Steel, Inc., 2011 WL 1899570 (11th Cir. 2011).

As further circumstantial evidence of pretext, Brown points to two EEOC charges filed against Berg by Rence Perkins and Michael Johnson on August 20, 2010. (Doc. 59-16).[5] The Eleventh Circuit held in Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1286 (11th Cir. 2008), that such "me too" evidence is admissible

---

[5] Brown sought to admit nine EEOC charges into evidence. However, seven of the charges were stricken by Judge Bivins in a June 2, 2011 Order (see Docket #67).

to prove the intent of an employer to discriminate.  However, unlike <u>Goldsmith</u>,

Brown's complaint does not include a pattern and practice claim. <u>Id.</u> at 1275.

Therefore, the only relevant evidence is that pertaining to actions taken against

Brown. <u>See</u> <u>Lane v. Terry</u>, 2010 WL 2721896, *17 (N.D. Ga. 2010).  Brown does not

allege that he was involved in either EEOC complaint, nor does either complaint

mention Brown.  In fact, they were filed more than one year after Brown's

termination.  Accordingly, the court finds that the EEOC charges do not establish a

genuine dispute of material fact as to pretext.

Brown also points to a handwritten note made by James Key, the human

resources manager, and dated February 23, 2009. (Doc. 82-1, p. 2).  The note

documents a meeting Key had with Rence Perkins, one of the employees who later

filed an EEOC complaint, as well as a meeting with Brown.[6]  As it pertains to

Perkins, the note must fail as evidence of pretext for the same reason that the

EEOC charges fail – Brown has not alleged a pattern and practice claim, and

therefore such "me too" evidence is irrelevant.  As it pertains to Brown, the note

does not tend to prove a pretextual reason for Brown's termination, and even tends

to suggest the opposite -- that Key did not transfer Brown from the coating mill for

racial reasons ("this is not what I said, just for the record").  Nevertheless, the note

---

[6] The note states in pertinent part that Perkins complained to Key because he believed that he was being passed over for a promotion to team leader, "I was hoping to avoid this type treatment [sic] but I see what I see. I hoped to stay here but if I continue to see this I will have to look elsewhere." (Doc. 82-1, p. 2). At the bottom of the same page, Key wrote that Brown came to his office and that "someone said to me that I transferred from coating because they are racist there. This is not what I said, just for the record." Id.

is sufficiently vague that it cannot rebut Berg's proffered reason that it terminated Brown for poor performance.

Finally, Brown asserts that the absence of disciplinary records in the personnel files of Johnson, Stanley Key, James Key, or Denis Desjardin, is circumstantial evidence of pretext, in light of Brown's complaint and the EEOC charges. (Doc. 81, p. 4). Brown claims that it is significant that Berg did not generate documentation of accusations made against these four supervisory employees. Id. The point of this argument is not totally clear to the court, but it appears that Brown wishes to allege that Berg did not properly investigate employee complaints of racial discrimination, in violation of its anti-discrimination policies. For example, Brown points to an excerpt from the deposition of Jim Key, the human resources manager, in which Key states that he retrained supervisors upon the advice of the company's legal counsel due to complaints of racial discrimination. (Doc. 82-4, p. 2). But there is nothing in Key's testimony to indicate that any of the complaints were made against the supervisors. Id. Nor does Key say anything about disciplinary action against a supervisor. Id. Brown does not cite one fact on the record which supports the notion that Berg failed to investigate accusations made against Johnson, Stanley Key, James Key, or Denis Desjardin, or failed to document disciplinary action taken against any of them. This simply is not enough for Brown to establish pretext.

Finally, Brown cites the Eleventh Circuit's recent opinion in Smith v. Lockheed-Martin Corp., 2011 WL 2567777 (11th Cir. June 30, 2011) for the

proposition that "[e]stablishing the elements of the <u>McDonnell Douglas</u> framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." <u>Id.</u> at *4. "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.' " <u>Id.</u> (<u>quoting</u> <u>Silverman v. Board of Education</u>, 637 F.3d 729, 733 (7th Cir. 2011)).

Brown asserts that <u>Lockheed</u> provides a sufficient basis upon which to deny summary judgment in the instant case. (Doc. 90, p. 2). He is mistaken. The Eleventh Circuit decided that the <u>Lockheed</u> plaintiff could survive summary judgment despite the fact that he could not point to a comparator, because the plaintiff produced a significant evidentiary record (the "convincing mosaic") that Lockheed-Martin had considered the plaintiff's race in their decision to terminate him. This evidence included a (i) spreadsheet which listed employees by name and race; (ii) a documented history of inconsistent treatment of white and African-American employees; and (iii) a television news expose covering racial tension and workplace violence at Lockheed-Martin.

As discussed in detail in the above paragraphs, the circumstantial evidence that Brown has provided falls short in comparison to the significant record provided by the <u>Lockheed</u> plaintiff, and certainly does not form a "convincing mosaic." Brown has offered the Court nothing with which to set aside or look beyond the <u>McDonnell</u>

<u>Douglas</u> framework, and accordingly cannot survive summary judgment on the issue of racial discrimination.

**B.     RETALIATION**

**(i)     Statement of the Law**

As with §1981 discrimination claims, when a plaintiff wishes to make a §1981 claim of retaliation with circumstantial evidence using the <u>McDonnell Douglas</u> framework, he first is required to establish a <u>prima facie</u> case.  In order to do so, the plaintiff must prove 1) that he engaged in statutorily protected activity; 2) that he suffered a materially adverse action; and 3) that there was some causal relation between the two events.  <u>Dixon v. The Hallmark Companies, Inc.</u>, 627 F.3d 849 (11th Cir. 2010).  The Eleventh Circuit construes the "causal link" element broadly, so as "to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated."  <u>Goldsmith,</u> 513 F.3d at 1278 (quoting  <u>Simmons v. Camden County Bd. of Educ.,</u> 757 F.2d 1187, 1189 (11th Cir. 1985)).

Once a plaintiff has established the <u>prima facie</u> elements of the claim, the defendant has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability. <u>Smith v. Lockheed-Martin Corporation</u>, 2011 WL 2567777, *2 (11th Cir. 2011).  The plaintiff must then prove that the reason provided by the employer is a pretext for prohibited retaliatory conduct. <u>Id.</u>

**(ii)    Brown's Retaliation Claim**

Brown alleges that while he worked in the coating mill, he complained to Jim Key, the human resources manager, that he felt he was not wanted in the coating mill because of his race and requested a transfer to the pipe mill. (Doc. 59-11, p. 26). Brown also drew Key's attention to the fact that Brown's image in a group employee photograph had been covered with a piece of paper. Id.  Brown maintains that his complaint to Key was the statutorily protected activity for which he was later terminated. (Doc. 62, p. 28).  Brown also states that he only complained about race discrimination to Key. Id.  Brown's complaint to Key took place slightly more than two months before his termination on April 25, 2009. (Doc. 93, p. 10).  Brown stated that he had no recollection of speaking about race to Key again. (Doc. 71-1, pp. 36-37).

A plaintiff can satisfy his burden of establishing a causal connection by showing temporal proximity between the protected activity and the retaliatory conduct. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). Where temporal proximity is the only evidence of causation, that proximity must be "very close." Id. (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).  In the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law.  A two month gap between the two events is not enough to establish causation. Williams v. Waste Mgmt., Inc., 2011 WL 207932, *3 (11th Cir. Jan. 25, 2011).  Here, the lapse in time between Brown's

complaint to Key and Brown's termination was two months, which is insufficient on its own to establish causation.

Temporal proximity is not the only means available to establish a causal connection even as to retaliatory acts occurring long after the protected activity, where those events are temporally linked by a chain of intervening retaliatory acts. Odom v. Mobile Infirmary, 2008 WL 748398 (S.D. Ala. March 17, 2008). However, Brown has not pointed to any such intervening acts that would be consistent with a causal link between his complaint to Key in February 2009 and his termination in April 2009. Accordingly, the court finds as a matter of law that Brown has failed to establish a causal connection. Brown has therefore failed to establish a prima facie case of retaliation.

The court's finding that Brown has failed to make out a prima facie case of retaliation is dispositive of this matter, but the court notes that even if Brown had made out such a prima facie case, it finds that he has failed to offer evidence to rebut Berg's proffered reason for Brown's termination. As discussed above in greater detail, under the McDonnell-Douglas framework, once a plaintiff has established the elements of a prima facie claim, the employer has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action as an affirmative defense to liability. Smith, 2011 WL 2567777, supra. The plaintiff then bears the ultimate burden of rebutting the employer's proffered reason as a pretext for prohibited retaliatory conduct. Id.

Berg asserts that Brown was terminated for poor performance during the introductory phase of his employment. (Doc. 48-1, p. 4), and bolsters its assertion with the testimony and declaration of Jim Key, its human resources manager; the testimony and declaration of Ken Johnson, Brown's supervisor; the declaration of Denis Desjardin, the pipe mill production manager; and the plain language of Brown's employment offer letter.

Brown, in turn, points to the EEOC charges filed by Michael Johnson and Rence Perkins as "me too" evidence that Berg's proffered reason for terminating Brown was pretextual. (Doc. 62, p. 25). For the reasons enumerated above with respect to Brown's discrimination claim, the court finds that this case is distinguishable from <u>Goldsmith</u>. Therefore, because neither Perkins nor Johnson's EEOC charges involve Brown (or Johnson or Desjardin, for that matter), they do not tend to prove that Johnson and Desjardin's decision to terminate Brown for performance reasons was a pretext for retaliation.

The court also reaches the same conclusion, for the reasons enumerated above with respect to Brown's discrimination claim, regarding the absence of disciplinary records for Johnson, Stanley Key, James Key, and Denis Desjardin, and regarding the handwritten note by James Key.

## C.     HOSTILE WORKING ENVIRONMENT

Brown alleges in his Memorandum in Opposition to Summary Judgment that he endured a hostile working environment while employed at Berg. (Doc. 62, pp. 4-

7; pp. 30-31). Yet Brown's Complaint does not state a claim for a hostile working environment, nor has Brown moved to amend his Complaint to include this additional count. It is within the court's discretion to take the Complaint at face value and hold that unpleaded claims are not before it. Coon v. Georgia Pacific Corp., 829 F.2d 1563 (11th Cir. 1987). Nevertheless, the court addresses Brown's Complaint as if it contained the additional claim and finds that summary judgment is due to be granted.

### (i) Statement of the Law

"A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir., 2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). A plaintiff must show that (1) he belongs to a protected group, (2) he has been subject to unwelcome harassment, (3) the harassment was based on a protected characteristic of the employee, such as race or national origin, (4) the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (5) the plaintiff's employer is responsible for such an environment, either directly or vicariously. Miller, 277 F.3d at 1275.

In order to determine whether harassment meets the "severe and pervasive" requirement, the court must consider an additional four factors in order to evaluate

the objective severity of the harassment, including: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance. <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1246 (11th Cir. 1999). The employee must establish not only that he subjectively perceived the environment as hostile, but that a reasonable person would perceive the environment to be hostile and abusive. <u>Barrow v. Georgia Pacific, Inc.</u>, 144 Fed. Appx. 54, 56 (11th Cir. 2005).

Furthermore, "[t]his is not, and by its nature cannot be, a mathematically precise test." <u>Harris</u>, 510 U.S. at 22. Whether a work environment is hostile can be determined only by looking at all the circumstances. <u>Id.</u> at 23.

**(ii)    Brown's Hostile Work Environment Claim**

The parties agree that Brown appeared in a group photograph of employees which was posted on a  bulletin board in the coating mill. (Doc. 93, p. 10). They also agree that the photograph was partially covered over with a piece of paper so as to obscure only Brown's image. <u>Id.</u>  Brown testified at deposition that he did not know who placed the paper on the photograph. (Doc. 48-1, p. 103). He has not offered any evidence that the photo was covered out of any racial animus on the part of a Berg employee. Berg, on the other hand, has offered the testimony and declarations of two supervisory employees, Jim Key and Jason Milam, which suggest that there was no racial element to the incident. Key stated that he investigated the matter on the same day that Brown brought it to his attention; that he found a pipeline

map obscuring the group photo; that he removed the map from over the photograph; and that he determined that the shipping supervisor, Jason Milam, had placed the map on the bulletin board. (Doc. 48-1, p. 3). Milam stated in his declaration that he placed the pipeline map on the board in order to encourage workers in the coating mill by showing them where their work product would end up, and that his covering of Brown's image in the photograph was inadvertent. (Doc. 48-1, p. 156). Brown testified at his deposition that he and Milam had little interaction with each other and no apparent conflict. (Doc. 48-1, p. 80).

Brown also alleges that he saw Berg employees with Confederate flag t-shirts and stickers, which offended him. (Doc. 62, p. 5). Brown also testified that no supervisors or co-workers at Berg ever directed a racial slur to him (Doc. 71-1, p. 38). And although Brown alleges that he overheard a comment that someone said in the Berg cafeteria regarding a "black ass," (Id. at p. 39), Brown admits that he does not know who made the comment, and states that he did not report it to anyone Id.

As an exhibit to his Response in Opposition to Summary Judgment (Doc. 59-15), Brown attached photocopies of photographs containing what he describes as "racially-motivated paraphernalia," at the Berg facility, including the aforementioned t-shirts and stickers; what appears to be a small, white, plastic figurine hanging by a rubber band from an office cubicle wall which Brown describes as a "noose baby" (Doc. 62, p. 4);[7] and what Brown claims is a "racial

---

[7] Berg disputes Brown's characterization of the plastic figurine, offering the Declaration of Kellie Roberts, a Berg employee at whose desk the plastic figure hung. (Doc. 71-1, pp. 63-64). Roberts asserts that the plastic figurine was a "small, white, plastic Baby Jesus" which she found (Continued)

comment" scrawled inside of a portable toilet. (Doc. 59-15, pp. 1-10). Brown did not submit original photographs, and the picture quality in the photocopies is so poor that it is difficult for the court to ascertain what is being presented. Furthermore, Brown admits that the photographs were not taken by him, nor were they taken while he was employed by Berg (Doc. 71-1, p. 60), raising serious doubt about whether he can allege to have "subjectively perceive[d]" much of the harassment he alleges in his brief.

Finally, Brown points to EEOC charges of retaliation filed against Berg by Rence Perkins and Michael Johnson, both on August 20, 2010, as evidence of a hostile work environment. (Doc. 59-16).[8]

Even if the Court regards as true all of Brown's allegations, they do not establish that Berg was "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of [Brown's] employment and create an abusive working environment." Barrow, 144 Fed. Appx. at 57-58 (quoting Harris, 510 US at 21). The incidents Brown complains of were not frequent enough to be pervasive, nor were they especially severe when compared with conduct that the Eleventh Circuit has found to fall short of severe harassment.

_____

in a Mardi Gras king cake in January or February 2010. Id. Roberts states that she tacked the plastic figurine onto her cubicle wall to remind herself to bring a king cake to the next Mardi Gras party she would be attending, and that the plastic figurine was not at her desk for more than two or three weeks. Id. This took place at least eight months after Brown's termination. Brown does not dispute Ms. Roberts' declaration.

[8] See Note 5, supra.

For example, the Eleventh Circuit found in <u>Barrow</u> that a group of African-American plaintiffs failed to establish a hostile working environment despite testimony that some plaintiffs saw Confederate flag stickers on toolboxes and hard hats; saw the letters "KKK" on a bathroom wall and on a block-saw console; saw a noose hanging in another employee's locker; and that one of the plaintiffs was called "nigger" three times in one year by a shift superintendent. <u>Barrow</u> at 57. Furthermore, the conduct Brown complained of was not physically threatening nor particularly humiliating, nor has he alleged that it interfered with his ability to perform his duties at work. While Brown may have been understandably offended at the sight of Confederate flags or stickers, or at the thought that his photograph might have been purposely covered over because he is African-American, these allegations simply do not meet the standard of severe and pervasive harassment set forth by the Supreme Court or the Eleventh Circuit and which are necessary to establish a <u>prima</u> <u>facie</u> case of hostile working environment pursuant to 42 U.S.C. §1981.


## V. CONCLUSION

Upon a thorough analysis of all matters presented, the court concludes that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. The Berg's motion for summary judgment (Doc. 47) is therefore **GRANTED** as to all claims.

**DONE and ORDERED** this 17th day of August, 2011.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE